IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KIMBERLY MICHELLE HRICKO, | * | |
| Petitioner | | |
| | * | |
| v. | | CIVIL ACTION NO. WDQ-05-2618 |
| | * | |
| BRENDA SHELL, et al., | | |
| Respondents | * | |

\*\*\*\*\*\*\*

## MEMORANDUM

On September 19, 2005, the Clerk received for filing Petitioner Kimberly Michelle Hricko's counseled 28 U.S.C. § 2254 attack on her 1999 convictions in Talbot County Circuit Court for first degree murder and attempted second degree murder and related offenses. Paper No. 1. Respondents answered the Petition. Paper Nos. 11, 15 and 16. Petitioner has filed a Reply. Paper Nos. 13, 18, and 21. After consideration of the pleadings and exhibits, the Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts; see also* 28 U.S.C. § 2254(d) & (e)(2). For reasons to follow, the Petition is hereby denied and dismissed with prejudice.

### I. Procedural History

On January 11-15, 1999, Petitioner was tried before a jury in the Circuit Court for Talbot County, the Honorable William S. Horne presiding. Paper No. 1. The facts adduced at trial as recounted by the post-conviction court are as follows:

> Kimberly and Steven Hricko married in March 1989. Within a year of the marriage, Kimberly gave birth to a daughter, Anna. Mrs. Hricko was a certified surgical technologist; Mr. Hricko worked superintending and maintaining golf courses. For sometime before the homicide, Ms. Hricko expressed general discontent with her marriage. In December 1997, Ms. Hricko met Mr. Brad Winkler, the cousin of her close friend. Mr. Winkler was a sergeant in the U.S. Marine Corps and ten years younger than Ms. Hricko; despite the age difference, the two embarked on a torrid affair. As the affair became more intense, Ms. Hricko grew more dissatisfied

with her husband, her desire to end her marriage increased, and eventually her plans to murder her husband developed.

In early 1998, Ms. Hricko told her husband that she wanted a divorce, and purportedly he broke down in tears and begged for a second chance. In this vein, Mr. Hricko began attending counseling and working on his marriage. Although Ms. Hricko expressed to her husband an interest in saving their marraige, she continued the affair with Mr. Winkler and confided in friends that her husband's efforts "made her sick."[1] With the belief that they were working on their marriage, Mr. Hricko scheduled a romantic weekend on Valentine's Day 1998 at Harbourtowne Resort in St. Michael's, which offered a dinner theater program and amenities. The couple checked into the resort the afternoon of February 14th, attended the 7 p.m. dinner show, and then between 10 and 10:30 p.m., retired to their cottage.

At approximately 1:20 a.m., Ms. Hricko drove to the lobby of the resort and calmly announced that her room was on fire. One of the employees, Philip Parker went to the cottage and could see smoke and the legs of a person inside. Mr. Parker was eventually able to pull Mr. Hricko from the room. Mr. Hricko's upper body and his left arm, which was raised, were badly burned. He was purportedly dead when Mr. Parker dragged him outside. Initially, it appeared that Mr. Hricko had died of smoke inhalation from a fire caused by the careless smoking of cigars. However, the investigation would eventually lead to the conclusion that Mr. Hricko died from an injection of Susuinalcolen (also spelled Succinylcholine.)[2] After an extended investigation and several interviews with Ms. Hricko, she was arrested 3 ½ months subsequent to her husband's death and charged with first and second-degree murder and arson.

Paper No. 7, Ex. 23 at 1-2 (footnote text omitted).

The jury returned a verdict of guilty of first degree murder and arson. Paper No. 7, Ex. 1. On March 19, 1999, Petitioner was sentenced to life imprisonment on the murder charge and a concurrent thirty year term for the arson charge. *Id.*

On appeal to the Court of Special Appeals of Maryland, Petitioner raised two questions:

1. Whether the evidence was sufficient to sustain her conviction; and

2. Whether the trial court erred in admitting testimony of the medical examiner on the cause of death.

Paper No. 7, Exs.10-12.

2

In a reported opinion filed on September 27, 2000, the Court of Special Appeals of Maryland affirmed Petitioner's convictions. *Id.*, Ex. 12. Thereafter, Petitioner filed a petition for writ of certiorari raising the same issues as raised in the intermediate appellate court. *Id.*, Ex. 13. The petition was denied by the Court of Appeals of Maryland on December 18, 2000. *Id.*, Ex. 14.

Petitioner then filed an original and amended petitions for post-conviction review in the Circuit Court for Talbot County. *Id.*, Exs. 1, 15-16. Petitioner alleged that trial counsel were ineffective for failing to:

1. Object to inadmissible testimony and argument;

2. Argue a theory of admissibility for exculpatory evidence;

3. Properly cross-examine the State's arson expert and offer exculpatory expert testimony regarding the arson charge;

4. Properly cross-examine the State's witness regarding toxicology issues and to offer exculpatory toxicological testimony;

5. Properly cross-examine the State's witnesses regarding pathology issues and to offer exculpatory pathological testimony; and

6. Move for dismissal of the indictment on grounds of grand jury abuse.

Petitioner also claimed that she was entitled to post-conviction relief based on the cumulative effect of trial counsels' errors. *Id.* After hearing, and the submission of post-hearing memoranda, the post conviction court issued a Memorandum and Order denying relief on all grounds raised. *Id.*, Ex. 20-23.

Petitioner filed an application for leave to appeal in the Court of Special Appeals, alleging that she was entitled to relief based on trial counsels' failure to conduct a reasonable investigation as to "the fire issues" and as to her husband's "medical issues" and based on the cumulative effect

of these errors. *Id.*, Ex. 24. On August 10, 2005, the Court of Special Appeals summarily denied the application for leave to appeal.

Petitioner filed this § 2254 Petition on September 19, 2005, alleging that her convictions should be overturned because trial counsel were ineffective for failing to properly investigate: "(i) the cause of the fire which burned in the motel room, in which Ms. Hricko and her husband were staying, and (ii) the medical evidence of the husband's cause of death." Paper No. 1. Memorandum. Specifically, Petitioner claims that the failure to investigate by trial counsel permitted the State to "parade junk science as established fact during trial," impeded trial counsels' ability to cross-examine the State's expert arson and medical witnesses, and led to trial counsels' failure to offer exculpatory evidence. *Id.* Petitioner further contends that even if none of these specific errors entitles her to relief, she is entitled to relief based on the cumulative effect of trial counsels' errors. Paper No. 1.

## II. Threshold Considerations

### A. Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), before a petitioner may seek habeas relief in federal court, he or she is required to exhaust each claim presented to the federal court by pursuing all available remedies available in state court. This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See* 28 U.S.C. § 2254(b) and (c). In Maryland, this may be accomplished by proceeding with certain claims on direct appeal to the Court of Special Appeals (and thereafter seeking certiorari to the Court of Appeals) and with other claims by way of a post-conviction petition followed by seeking leave to appeal from the Court of Special Appeals. Petitioner no longer has direct appeal or post-conviction

remedies available in connection with the claims raised before this Court and thus she has exhausted the claims presented here.

### B. Statute of Limitations

There is no contention that the Petition is time-barred pursuant to 28 U.S.C. §2244(d).

### C. Procedural Default

There is no contention that Petitioner's claims are procedurally barred.

## III. Standard for § 2254 Review

Because this Petition was filed after April 24, 1996, it is to be decided under amendments to the habeas corpus statutes contained in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003); *Beck v. Angelone*, 261 F.3d 377, 380 n.3 (4th Cir. 2001). AEDPA modified the federal court's role in habeas proceedings in order to prevent federal "retrials" and to ensure that state court convictions are given effect to the extent possible under law. *See Bell v. Cone*, 535 U.S. 685, 693 (2002). Pursuant to statute, a federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*). In *Williams v. Taylor*, 529 U.S. 362 (2000), Justice O'Connor explained that a state court decision is "contrary to"

clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412-413. A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

Further, federal courts must give great deference to a state court's factual findings. *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary. The applicant has the burden of rebutting the presumption of correctness. A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). With these standards in mind, the Court will address the merits of Petitioner's claims.

**A.      Petitioner's Sixth Amendment Claim**

To establish a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a convicted defendant must demonstrate that counsel's performance "fell below an objective standard of reasonableness," and that counsel's deficient performance prejudiced the defendant. *Id.* at 688, 692. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the

trial cannot be relied on as having produced a just result." *Id.* at 686. The ultimate focus of the *Strickland* inquiry is on the "fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696.

In evaluating whether counsel's performance fell below an objective standard of reasonableness, a court must consider "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. In its analysis, a court must be "highly deferential," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotations omitted). A court must not use the benefit of hindsight to second-guess strategic decisions made by counsel unless they were unreasonable. *Id.* at 690.

With regard to the prejudice prong of *Strickland*, a defendant need not demonstrate that the outcome of the proceeding would have been different, but rather that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Even if counsel committed a professionally unreasonable error, relief can be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

1. **The Arson Issues**

The State's theory at trial was that Petitioner murdered her husband by poisoning him and then set a fire in the room where they were staying to disguise the murder. Petitioner discovered the fire. At trial, the defense contended that the evidence was insufficient to demonstrate murder or arson. Included in this defense was the contention argued during summation that the victim may

7

have committed suicide and the fire may have been accidental. At trial, the State presented expert evidence regarding the incendiary nature of the fire in the hotel room in an effort to rule out a defense based on the accidental nature of the fire. Petitioner maintains that trial counsel did not adequately select or work with an arson expert, and "failed to learn what they needed to know about arson..." Paper No. 1, Memorandum.

In rejecting Petitioner's claim that trial counsel failed to adequately investigate the arson issues, the state post-conviction court found as follows:

> Petitioner retained Dr. Gerald L. Hurst, Ph.D. as a fire expert witness. Dr. Hurst testified on Petitioner's behalf via telephone deposition on June 15, 2004. Without conducting experiments or considering a time line of relate events, Dr. Hurst supported post conviction relief by disputing various points of Fire Marshal Mulligan's testimony. Subsequent to Dr. Hurst's testimony Petitioner alleges trial counsel was deficient in not properly cross-examining Fire Marshal Mulligan (particularly regarding a **theory of flying ember** in causing the fire) and in not offering exculpatory arson expert testimony. Petitioner also alleges these deficiencies prejudiced the outcome of her trial.
>
> Dr. Hurst testified regarding his main contention with Fire Marshal Mulligan's testimony- "Mulligan expressed an opinion that a synthetic fire log would not have enough power...to eject an ember over a distance of 512 inches, and there's nothing in the literature that you could base that on." "The embers could have been tossed out when that fire was in its dying stages and was only putting–when the fire was in its dying stages, it could still have kicked an ember out..." Against Respondent's objection as speculative, Dr. Hurst testified, "Any fire investigator in the '90s following accepted procedure in fire investigation would have been compelled probably against his will to rule the cause and origin of the fire as **undetermined** because there is no sensible way that you can eliminate a stove that has an open door particularly with that opening facing the general origin of the fire." (Emphasis added). Dr. Hurst further testified he did not have an opinion as to what caused the fire; he could only say he was unable to eliminate the stove, the cigar, or arson.
>
> Trial counsel enlisted George Meyer, Senior Fire Investigator with Trident Engineering Associates, Inc., as an arson expert to assist in trial preparation. Mr. Meyer assisted counsel by helping them become more educated about the subject matter and by confirming the reliability of the State's expert opinion. Trial counsel supplied Mr. Meyer with photographs, measurements, samples and testing results from the room for review. Subsequently, trial counsel relied on Mr. Meyer's


opinions, analyses, and expertise in developing their cross examination of Mr. Mulligan and in developing their cause of fire theory.

In addition to enlisting the expertise of Mr. Meyer, trial counsel relied on transferable knowledge obtained from previous research and experience, meeting with the State Fire Marshal (Mr. Mulligan), meeting with the fire investigator representing the insurance company for Harbourtowne (Terry Wagner), and additional education they obtained from reading various texts and articles provided by Mr. Meyer and others, and researching on the Internet.

Trial counsel successfully persuaded the trial judge in prohibiting Mr. Mulligan from rendering an opinion of incendiary origin. Aware that the three fire experts agreed the cigar may not have been able to generate enough heat to start the fire, counsel tried to minimize Mr. Mulligan's opinion by focusing on the possibility of an accidental fire from an artificial log or from a match used to light a cigar.

Counsel made a tactical decision not to put Mr. Meyer on the witness stand. Counsel stated, "Once Judge Horne had excluded the conclusion that it was a set fire, I felt that was good for us and I did not want to run the risk of having even our own expert get manipulated into raising the possibility that it was, in fact, a set fire." We needed to prove, we needed to keep out evidence that it was a set fire...I really didn't care how it started as long as it wasn't a set fire....If we keep out that it was a set fire, we were ahead of the game, and if the fire started near the deceased's head, I felt we were also ahead of the game."

Counsel stated, "Our theory was that the State couldn't prove that it was arson...that it was the State's burden to prove that it was a set fire and there were alternative theories to that, and that the State...could not meet its burden." Regarding the origin of the fire, "We considered every cause that we could think of. And, the point of origin, you know, we...looked for that. It...a spark could have...landed on the floor, could have landed on the bed."

Applying *Strickland*, petitioner must show that counsels' performance was deficience and as a result of that deficiency, prejudice the defense. To establish that counsel was deficient, the *Strickland* test requires the Petitioner to 1) identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment, 2) show that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment, and 3) overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. The Sixth Amendment does not require the best possible defense or that counsel render a prefect defense. In order to be deficient, counsel's acts or omissions must be "outside the wide range of professionally competent assistance." Further, under *Wiggins*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."

9

Here, unlike *Wiggins* or *Merchant* where counsel failed to gather vital information that was "short of the professional standards that prevailed in Maryland" and under the American Bar Association, counsel took extensive measures to gather information, establish a reasonable theory and give effective assistance of counsel to the Petitioner.

Considering all the circumstances, the Court finds that counsel demonstrated performance that was reasonable under prevailing professional norms in:

- Enlisting the assistance of a senior fire investigator as an arson expert to assist in trial preparation.
- Supplying the fire investigator with photographs, measurements, samples and testing results from the room for review.
- Relying on the expert fire investigators opinions, analyses, and expertise in developing and subsequently cross-examining the State's Fire Marshal expert.
- Relying on the expert fire investigator's opinions, analyses, and expertise in developing their cause of fire theory.
- Relying on transferable knowledge obtained from previous research and experience in arson cases.
- Meeting with the State Fire Marshal and the fire investigator representing the insurance company to obtain their input on the cause and origin of the fire.
- Obtaining additional education on the subject matter by reading texts and articles and by researching on the Internet.
- Persuading the trial judge not to allow the State's Fire Marshal expert to render an opinion of incendiary origin.
- Tactically attempting to minimize the State's Fire marshal's opinion on cross-examination by **focusing on the possibility of an accidental fire from an artificial log** or from a match used to light a cigar.
- **Tactically deciding not to put on expert testimony** to avoid the risk of having their expert manipulated into raising the possibility that it was in fact a set fire.
- Establishing a **"reasonable doubt"** theory.

"There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Here, it is clear that counsel's actions were valid trial tactics and reflected reasonable professional judgment. In order to be deficient, counsel's acts of omissions must be "outside the wide range of professionally competent assistance." Here it is clear counsels' acts were valid trial tactics. However, even assuming that counsel's failure to develop the flying ember theory or to put on expert fire witness testimony was deficient, due to the overwhelming aggravating circumstances, the Petitioner has not proven that this action, or failure of, had an adverse effect to the defense, therefore Petitioner has failed to meet her burden under *Strickland*.

Paper No. 7, Ex. 23, pp.10-14 (footnotes omitted)(emphasis in original).

The fact that counsel could have called other witnesses does not establish that the attorney's performance was outside the wide range of reasonably effective assistance, particularly in light of the fact that trial counsel did far more than consult with one arson expert prior to trial, in an effort to mount an appropriate defense to the State's case. Trial counsel cross-examined the State's arson expert regarding other innocent means by which the fire could have started, further advancing their reasonable doubt defense. Trial counsels' fear that calling their own expert witness, George Meyer, during trial would re-open the door to opinions regarding the nature of the fire after having successfully limited the State's arson expert unfavorable testimony was reasonable under the circumstances. Trial counsels' decision not to have their expert testify at trial was based on their belief that they had minimized the adverse effect of the State's expert. Petitioner argues that trial counsels' investigation was deficient not because they did not call George Meyer to the stand during trial, but because "Mr. Meyer did not have an adequate grasp of the exculpatory analysis arising from the undisputed facts of the fire" (Paper No. 1, Memorandum), and as such trial counsel had set out with the wrong expert witness. Thus, Petitioner claims, trial counsels' representation was constitutionally deficient. Petitioner's assessment is not born out by the record. Trial counsel did more than consult with Mr. Meyer in preparing Petitioner's defense of the arson charge. As noted by the post-conviction court, counsel consulted with several arson experts regarding their theory of the nature of the fire, as well as relied on their own transferable knowledge from previous arson cases, as well as independent learning via treatises regarding arson analysis.

The defense was one of reasonable doubt, consisting of demonstrating innocent alternatives to the State's theory of the case. This Court agrees that trial counsels' investigation in order to mount a defense to the arson charge was reasonable under the circumstances and that there was no

11

prejudicial error in failing to provide other evidence regarding the arson. Without a harmful or prejudicial result, the fact that counsel did not do more does not establish ineffective assistance to Petitioner. *See Horne v. Peyton*, 356 F.2d 631, 633 (4th Cir.1966). Petitioner has not offered any evidence that but for the alleged deficient performance of trial counsel, the result of the trial would have been different. Additionally, having examined the post-conviction court's ruling and having independently examined the record, this Court is satisfied that in applying the *Strickland* standard to the instant allegations of trial counsels' allegedly deficient performance, Petitioner has not demonstrated that counsels' performance was deficient or that she was prejudiced by their conduct. *See* 28 U.S.C. § 2254(d); *see also Stamper v. Muncie*, 944 F.2d 170, 178 (4th Cir. 1991) (challenge to counsel's trial decisions and/or tactics amounted to no more than "Monday morning quarter backing."). Furthermore, the post-conviction court's analysis does not amount to an unreasonable application of controlling Supreme Court precedent.

### 2. The Victim's Medical Issues

In rejecting Petitioner's claim that trial counsel inadequately investigated "the victim's medical issues" the post-conviction court stated:

> Petitioner also alleged during the post conviction hearing that trial counsel was deficient in not properly cross-examining the State's expert witnesses regarding the cardiac side effects of the medications Pseudoephedrine and Venlafaxine (Effexor), the description of the victim's former EKG and the possibility of Sudden Cardiac Death.
>
> Petitioner retained Dr. Friedlander, a general pathologist, as an expert witness for the post conviction hearing. Dr. Friedlander testified his opinion was based on his review of the autopsy report and Dr. Fowler's testimony. He had not spoken to Dr. Fowler or Dr. Adams, nor had he reviewed autopsy slides or back up notes. Dr. Friedlander testified that Dr. Fowler had eliminated some of the causes of Sudden Cardiac Death, but others he did not show were eliminated because multiple sections of the heart would have to be examined to eliminate Sudden Cardiac Death and the autopsy report did not specify the number of sections taken. Asked if he believed good practices would have led Dr. Fowler to thoroughly examine the heart for possible Sudden Cardiac Death Dr. Friedlander testified, "I don't know, I'm not

absolutely certain that he didn't do it but I don't see it reflected in his documentation." Dr. Friedlander indicates Sudden Cardiac Death would have been an innocent cause of death that should have been more thoroughly explored and cross-examined.

Trial counsel enlisted Dr. Adams, a forensic pathologist to assist in trial preparation. Dr. Adams assisted counsel by helping them become more educated about the subject matter, for effective cross-examination of the State's witnesses, and to confirm scientific reliability and accuracy of the State's expert's opinions. Defense counsel made a tactical decision to have Dr. Adams testify because, "Dr. Fowler was allowed to testify that he cause of death was probably poisoning and that was...a bad fact for us and we needed to rebut that cause of death."

Regarding preparations for the trial Dr. Adams testified, "I have reviewed police reports...[t]he autopsy report created by Dr. Fowler. A toxicology report from the Office of the Medical Examiner. I've seen the scene photographs. I've reviewed witness statements. I reviewed microscopic slides that are part of the autopsy...[and] I looked at a diary of the decedent ...as well as some of his medical records.. Dr. Adams also testified, "I...looked through the Medical Examiner's record of this case...[which is] the back up material that backs up the autopsy report. It's the notes and reports...that constitute the material from which...the autopsy report is a final product." Regarding the cause of death listed on the autopsy report as "probable poisoning and manner of death homicide" Dr. Adams testified his opinion was, "this cause of death as stated in this report is not proper and my opinion is that the cause of...death is unknown...[and] the manner of death is undetermined." Dr. Adams further testified, "it's impossible in this case to...know what the manner of death is, i.e. whether it's natural, homicide, suicide, accident or whatever." Dr. Adam's testimony also challenged the State's theory by testifying to the amount of Succinylcholine that would have to be used and the difficulty of injecting it.

During defense counsel's cross examination of the State's expert (Dr. Fowler) the following discourse took place regarding additional "Q" waves on a former EKG of the deceased victim establishing defense counsel's awareness of Sudden Death related to cardiac disorders:

> Q–Now there is also a phenomenon called long Q's, is that correct?
> A–Yes, there's something called long QT syndrome.
> Q–Yes, long QT syndrome. And that really doesn't cause any physical damage to the heart, it's more of an electrical arrhythmia problem with the heart, its that correct?
> A–Yes.
> Q–Okay. And the problems with the long QT, I guess it's called long QT syndrome, is really the electrical impulse, that is the beating of the heart, the manner in which the heart beats, is that correct?
> A–Yes, electrical activity controls how the heart actually beats.

Q–All right. And then that, if that occurred, that could cause **sudden death** in an adult, is that correct? (emphasis added)
A–Yes, I can imagine it would. Be a potential cause.
Q–I'm sorry.
A–It would be a potential cause of death, yes.
Q–Potential cause of death and that really doesn't leave a lot of muscle damage, evidence of that, isn't that correct?
A–Correct.

The theory of neurogenic shock or neurogenic responses to a hot fire, which would cause rapid death, was developed during Dr. Adam's testimony. Defense counsel testified, "the strategy was, the point of origin near the victim's head would be consistent with some spark or something...near the victim's head, boom, causing his death and that got us around the lack of carbon monoxide, and that got us to solve our medical problems on the cause of death." Other scenarios presented, to establish reasonable doubt as to the cause of death, included admitting bottles of pills and testimony about some suicidal thoughts, and prescription bottles to suggest alternative theories inconsistent with guilt.

In addition to retaining Dr. Adams, defense counsel purchased books and reviewed treatises on forensic pathology in preparation for the case. Applying *Strickland*, Petitioner must show that counsels' performance was deficient and as a result of that deficiency prejudice the defense. To establish that counsel was deficient, the *Strickland* test requires the Petitioner to 1) identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment, 2) show that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment, and 3) overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. The Sixth Amendment does not require the best possible defense or that counsel render a perfect defense. In order to be deficient, counsel's acts or admissions must be "outside the wide range of professionally competent assistance." Further, under *Wiggins*, "counsel has a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary."

Here, unlike *Wiggins* or *Merchant* where counsel failed to gather vital information that was "short of the professional standards that prevailed in Maryland" and under the American Bar Association, counsel took extensive measures to gather information, establish a reasonable theory and give effective assistance of counsel to the Petitioner.

Considering all the circumstances, the Court finds that counsel demonstrated performance that was reasonable under prevailing professional norms in:

-- Enlisting a forensic pathologist to assist in trial preparation, to help educate them in the subject matter, and to confirm scientific reliability and accuracy of the State's expert's opinions.

- Developing the theory of neurogenic Shock.
- Presenting scenarios to establish "reasonable doubt" as to the cause of death, such as testimony about suicidal thoughts and admitting bottles of pills and prescription bottles to suggest alternative theories inconsistent with guilt.
- Purchasing books and reviewing treatises on forensic pathology in preparation for the case.
- Making tactical decisions regarding putting on testimony of their expert witness and cross-examination of the State's witnesses regarding pathology issues.

There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. Here, it is clear that counsel's actions were valid trial tactics and reflected reasonable professional judgment that did not prejudice the Petitioner. Petitioner's failure to make the required showing of deficient performance and sufficient prejudice defeats her ineffectiveness claim.

Paper No. 7, Ex. 23, PP 15-19 (emphasis in original)(footnotes omitted).

In addressing the adequacy of trial counsels' investigation of the toxicology issues, the state post-conviction court further held:

Trial Defense counsel enlisted Dr. Yale Caplan, a former State Toxicologist and well-known expert to assist in trial preparation. Defense counsel stated they hired him because, "Dr. Fowler's report listed as a cause of death "probable poisoning." (quotation marks added). We wanted some advice in that area, because we didn't see that there was...objective scientific evidence of poisoning in this case...[a]nd we wanted him to look at the evidence of poisoning in the case...[a]nd we wanted him to look at the combination of substances that was in the decedent's system according to the medical examiner's report...we also wanted to learn a little something about Sustinalcolene, which was...offered as possible cause of death."

Dr. Caplan assisted counsel by helping them become more educated about the subject matter, for effective cross-examination of the State's witnesses and to confirm reliability of the State's expert's opinions. The State's expert witness was cross-examined by defense counsel on issues related to Venlafaxine (also known as Effexor) and Sustinalcolene on January 14, 1999. During the cross-examination, the State's expert acknowledged that if Sustinalcolene had been injected intramuscularly it was possible that some residue of the drug would be found at the injections site, if it had not metabolized at the point of entry. He also testified he had found "no scientific or medical evidence of any poison or any toxin in the blood of the deceased."

Case 1:05-cv-02618-WDQ   Document 13   Filed 11/27/06   Page 16 of 18

Defense counsel stated their strategy was "[w]e were looking for any other cause of death from Mr. Hricko, other than Succinylcholine." Regarding discussions with Dr. Caplan concerning Venlafaxine and Pseudophedrine, defense counsel stated, "I remember talking to Dr. Caplan, saying....Is there a chemical here that could have interacted with something else that could have caused Mr. Hricko's death? And we would have relied on Dr. Caplan's expertise as an expert toxicologist to give us guidance in that area."

Defense counsel cross-examined the State's witness regarding the effects of mixing, Effexor, Pseudophedrine and alcohol on January 14, 1999.

Once again the post-conviction court restated the requirement of *Strickland* and the pronouncement of *Wiggins* regarding counsel's duty to investigate and found:

> Here, defense counsel reasonably enlisted and conferred with an expert toxicologist to assist in preparing for cross-examination of the State's witnesses and to assist in the development of reasonable trial theory and defense strategy. Unlike *Wiggins* or *Merchant*, defense counsel had expanded their investigation of the information needed in the case by retaining appropriate experts and using the experts reasonably in establishing trial tactics. Petitioner therefore has not met her burden of establishing the first prong of *Strickland*. Had the Court determined defense counsel was deficient in choosing and utilizing the expert in this case, petitioner would also have had to show the deficiency did in fact prejudice her defense. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." But rather the petitioner would have had to show, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Petitioner has not convicted the Court that defense counsels' actions were deficient or that the outcome of the proceeding would likely to be changed had defense cross-examinations been different. Therefore petitioner's claims are shown to be conclusively without merit.

Paper No. 7, Ex. 34, pp.14-15 (footnotes omitted).

The state court's recitation of the facts as adduced at trial and the post-conviction hearing concerning the medical evidence are supported by the record. The state court correctly applied *Strickland* in finding no error on the part of defense counsel in failing to pursue the "Sudden Cardiac Death" theory. Even assuming, *arguendo*, that counsel's failure to more fully investigate the medical history of the victim was error, Petitioner has failed to demonstrate that such deficient performance rendered "the result of the trial unreliable or the proceeding fundamentally unfair." *See Lockhart*

16

*v. Fretwell*, 506 U.S. 364, 372 (1993). The Court sees no reason to overturn the decision of the post conviction court. The state court findings do not involve an unreasonable application of *Strickland* and more than satisfy the §2254(d) standard of review. Accordingly, the state court's decision shall not be disturbed. *See* 28 U.S.C. §2254(d) and (e).

### 3. Cumulative Error

Petitioner next contends that if neither of the aforementioned errors alleged entitles her to relief, she is nonetheless entitled to relief based on the cumulative effect of these errors. The state post conviction court rejected this claim finding:

> Petitioner also alleges that the effect of the foregoing errors by her trial counsel "denied (Petitioner) effective assistance of counsel at trial in violation of the Sixth Amendment, the Maryland Declaration of Rights and Maryland law." Petitioner cites *Bowers v. State*.
>
> In *Strickland*, the Supreme Court stated, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process at the trial cannot be relied on as having produced a just result."
>
> "[A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge to or jury." A court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.
>
> In *Bowers* the court stated that an alternative ground for holding that the defendant received ineffective counsel was that the "cumulative effect of numerous errors on the part of [counsel] also deprived [petitioner] of the effective assistance of counsel."
>
> The court stated, "It is necessary to look at the trial as a whole...Even when individual errors may not be sufficient to cross the threshold, their cumulative effect may be."
>
> The Court finds, pursuant to the standard set forth in *Strickland*, that Petitioner was not denied the effective assistance of trial counsel. All the acts or omissions specifically identified by petitioner as ineffective assistance of trial or appellate counsel, did not, individually or cumulatively, rise to the level of prejudicing her defense.

> The Sixth Amendment does not require the best possible defense or that counsel render a perfect defense–in order to be deficient, counsel's acts or omissions must be "outside the wide range of professional competent assistance." The Supreme Court in *Strickland* stated that, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the challenged judgment of a criminal proceeding if the error had no effect on the judgment."
>
> The Court finds that none of the alleged acts or omissions of trial or appellate counsel, individually or cumulatively, prejudiced Petitioner's defense. Nor does this Court find that the proper functioning of the adversarial process was undermined, or that the trial cannot be relied upon as having produced a just result.

Paper No. 7, Ex. 23, pp 19-20 (footnotes omitted).

This Court is in agreement. Claims of ineffective assistance must be reviewed individually, not collectively. *See Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998). Petitioner contends that the foregoing allegations of error, considered cumulatively, were tantamount to a denial of a fair trial. This claim does not warrant habeas relief. Because none of the issues raised by Petitioner could be considered error, she cannot string them together in hopes of forming a constitutional violation. *Id.* at 852-53 (noting that with respect to claims of attorney error, like claims of trial court error, the cumulative-error analysis appraises only the effect of matters actually determined to be constitutional error and not the cumulative effect of all matters deemed deficient).

## IV. Conclusion

In light of the foregoing, the Court sees no reason to overturn the state court conviction. The state post-conviction court's ruling does not involve an unreasonable application of *Strickland* and satisfies the §2254(d) standard of review. Accordingly, this Petition for habeas corpus relief shall be denied and the case shall be dismissed with prejudice. A separate Order follows.

Date: 11/27/06

William D. Quarles, Jr.
United States District Judge